UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| EDWARD LEE CAIN, JR., | : | Case No.  13-50208-jrs |
| | : | |
| Debtor. | : | |
| _____ | : | |
| | : | |
| RUDY C. DURAND and | : | ADVERSARY PROCEEDING |
| JEFFREY DURAN | : | NO. _____ |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| EDWARD LEE CAIN, JR., | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

**COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT**

**NOW COME** RUDY C. DURAND ("DURAND") and JEFFREY DURAN ("DURAN") (together, the "Plaintiffs") and file this Complaint to determine the dischargeability of debts owed by EDWARD LEE CAIN, JR. ("CAIN," "Defendant" or "Debtor") to Plaintiffs, pursuant to 11 U.S.C. § 523, and allege as follows:

**JURISDICTION AND PARTIES**

1.      Plaintiff JEFFREY DURAN is a resident of Houston, Texas and is the sole and true owner of all right, title and interest in the property located at 324 North Palms Drive, #403, Beverly Hills, California (the "Property").

2.      Plaintiff RUDY C. DURAND is a resident of Beverly Hills, California, and resides at the Property, 324 North Palms Drive, #403, Beverly Hills, California.

3. Defendant is the Debtor in the captioned Chapter 11 case.

4. Defendant is subject to the jurisdiction of this Court.

5. This is an action under 11 U.S.C. §§ 523(a)(2) and (a)(6) in which Plaintiffs object to the grant of a bankruptcy discharge to Defendant to the extent the general discharge relates to the Defendant's debt owing to Plaintiffs.

6. This Court has jurisdiction over this case under 28 U.S.C. § 157 and § 1334.

7. This adversary proceeding constitutes a core matter under 28 U.S.C. § 157(b)(2).

## GENERAL FACTUAL ALLEGATIONS

8. DURAND is a distinguished, decorated combat Korean War veteran. He is a man of considerable accomplishment and notoriety in the entertainment, political, and business communities in the Los Angeles area.

9. DURAND was born April 18, 1931 and at all relevant times was an "elder" adult as defined in California Welfare & Institutions Code Section 15610.27.

10. Prior to the frauds and wrongs by CAIN as alleged herein, DURAND and CAIN were friends and business associates, for many years.

11. At all relevant times, DURAND was the owner of the Property. Continuously since his acquisition in 1999, DURAND was the sole occupant of the Property, and he remains the sole occupant.

### CAIN's Scheme to Take, Use and Keep DURAND's Property

12. In or around March 1999, DURAND purchased the Property, a condominium.

13. In or about August 2002, DURAND secured a first mortgage with Washington Mutual in the approximate amount of $410,000. DURAND's interest rate on the mortgage with Washington Mutual was approximately 12.5%.

2

14. From the mid-1980's and throughout the 1990's, CAIN frequently contacted DURAND to elicit his support and assistance for a variety of business ventures. CAIN typically sought out DURAND to invest in such ventures, as well as to provide services including services due to DURAND's advertising and public relations expertise, and sought to utilize DURAND's experience in paralegal-type services regarding legal matters. CAIN also sought access and introductions to DURAND's considerable contacts, for the benefit of CAIN's ventures.

15. In or around April 2003, in connection with CAIN's inducing DURAND's continued interest in and assistance with CAIN's planned lawsuit against H&R Block, Inc., as well as with CAIN's new company called "PAGSTA," CAIN offered to do DURAND a "favor," by assisting him in reducing the mortgage interest rate that DURAND was paying on his residence, the Property.

16. DURAND emphasized to CAIN that DURAND was inexperienced in real estate matters and that DURAND's condominium was the only home he had ever owned. CAIN informed and assured DURAND that CAIN was knowledgeable in real estate matters, and that CAIN enjoyed a very favorable banking relationship with Bank of America, N.A. ("BofA") in CAIN's home state of Georgia. CAIN claimed to DURAND that, as a "premier" or "preferred" bank customer, CAIN could arrange to refinance DURAND's mortgage, to obtain a new loan with a substantially lower interest rate, a loan that DURAND could later take over on the same favorable terms.

17. Over the next two (2) months, CAIN repeatedly communicated with DURAND regarding the proposed refinance plan. As CAIN represented to DURAND, the proposed process required CAIN to be able to show the bank some legal interest of CAIN in the Property, in order to have the Property refinanced through CAIN's banking contacts. CAIN told DURAND, for the

3

purpose of inducing DURAND's actions, that to accomplish the refinance plan, DURAND would need to execute a deed in favor of CAIN. CAIN explained that by doing so, CAIN could show his bank a sufficient legal interest in the Property to secure the new loan, while DURAND would maintain a "Life Estate" form of interest in his Property until title was later returned by CAIN.

18. CAIN's continued efforts to encourage DURAND to make the transfer included CAIN's representations that he would be able to reduce DURAND's interest rate to 5%, or lower, and CAIN assured DURAND that there was nothing improper about CAIN obtaining a deed from DURAND under such circumstances and that the deed would be extinguished upon completion of the refinance process. CAIN, through his agent and assistant, Anna Kristen Cain (n/k/a Williamson), specifically stated in an e-mail to DURAND:

> What needs to be done is to have a Quitclaim Deed recorded which would put Ed's name on the Deed. Without Ed's name on the Deed the condo cannot be refinanced at a lower rate. So we need to get a Quitclaim deed recorded as soon as possible with Ed's name on it. A Quitclaim Deed is fairly simple, I'll see if I can get you a blank one.

19. CAIN and Ms. Cain on his behalf thereafter engaged in a series of communications and a course of conduct under which CAIN induced DURAND to transfer full title ownership of DURAND's home to CAIN, under a ruse described as a necessary part of the process to accomplish the refinance efforts for DURAND. CAIN continued to promise and assure DURAND that CAIN would reconvey title to DURAND once the refinance process was completed.

20. In reliance on their extended and trusting relationship, as well as the repeated representations and assurances by CAIN, DURAND agreed to proceed with the refinance plan as described by CAIN. On or about October 28, 2003, DURAND therefore executed a Quitclaim Deed of the Property to CAIN. The Quitclaim Deed was recorded on November 3, 2003. Such

4

reliance by DURAND was justifiable for reasons that included that DURAND and CAIN had been friends and business associates for many years. At all times, DURAND was unaware of and had no way of knowing CAIN's true plans and intentions with regard to DURAND's Property.

21.   CAIN repeatedly contacted DURAND by telephone and e-mail to assure DURAND that the refinance plan process was moving along, and CAIN would request specific information from DURAND about the Property.

22.   Following several repeated assurances that the closing of the refinance transaction was imminent, in late 2003 and very early 2004, CAIN told DURAND that BofA was now requesting a "lease agreement" that reflects DURAND as a tenant in the Property. Based upon the request by CAIN, purportedly BofA's request, DURAND agreed to execute a lease agreement.

23.   According to CAIN's explanation and representations, DURAND's legal and other interests in the Property would be better protected with a written "life lease" to reflect that DURAND was renting the Property from CAIN until DURAND formally assumed the new loan. CAIN caused DURAND to believe that the lease document would operate as a guarantee, in writing, to DURAND that DURAND could not lose his home until such time as DURAND could formally take over the new loan in his own name, from BofA. CAIN assured DURAND that the amount of the "rent" would equal the mortgage payment, plus condo association fees, and that the "lease" would state for the duration of DURAND's life. Relying on the promises and advice of CAIN, DURAND executed the Lease Agreement on or about January 4, 2004.

24. At all times prior to the initiation of the supposed refinance plan, DURAND had been making all of his mortgage payments on a timely basis. Shortly before the first represented refinance loan closing date, CAIN advised DURAND that DURAND did not need to make the mortgage payments because the new loan was being secured.

25. DURAND then began making some payments, however, at CAIN's request. Since the Property was vested in CAIN's name for purposes of the refinance transaction, CAIN requested that the payments be made to CAIN. CAIN promised to pay such amounts from DURAND to DURAND's then-existing lender until the new refinance loan closed. Therefore, DURAND made the payments to CAIN before the refinance closing, as requested.

26. DURAND is informed and believes, and thereupon alleges, that instead of CAIN paying the DURAND payments to the prior lender as CAIN promised, CAIN actually intended to keep and did keep each such payment for himself. That fraud and misappropriation caused DURAND's prior mortgage to go into arrears and caused the incurrence of costs and penalties with that lender prior to the closing on the new refinance loan. DURAND is informed and believes that such arrearage, plus the penalties and related charges, were ultimately added to the payoff amount on the prior mortgage and therefore added to the balance of the new refinanced loan, all without DURAND's knowledge or consent.

27. Because CAIN was in arrears on compensation promised DURAND for DURAND's work that CAIN requested for PAGSTA, CAIN represented and promised to DURAND that CAIN would begin making the mortgage payments on DURAND's newly-refinanced mortgage in lieu of the compensation owed to DURAND.

**CAIN's Pledges and Retention of DURAND's Property**

28. DURAND is informed and believes and thereon alleges that, on or about February 19, 2004, still prior to the closing of the refinancing loan with BofA, CAIN secretly and without DURAND's knowledge or consent, pledged the Property as collateral to secure a personal guarantee that CAIN executed in favor of FIRST COASTAL BANK, N.A., to induce a line of credit for $1,000,000 for CAIN's company, PAGSTA.

29. Upon information and belief, CAIN further encumbered the Property by granting a Deed of Trust to BofA, to secure an obligation of CAIN in the approximate amount of $591,000.00, far greater than DURAND's balance with the prior lender. This Deed of Trust was recorded on April 20, 2004.

30. CAIN told DURAND that payments from DURAND were not required and that the new mortgage would be paid by CAIN, because of the compensation owed to DURAND in connection with DURAND's services for PAGSTA. Therefore, upon learning that a refinance loan had closed and that all payments were being handled by CAIN, DURAND made no further payments.

31. DURAND is informed and believes and thereon alleges that, upon closing of the newly-refinanced mortgage, CAIN did begin to make, or caused to be made by PAGSTA, payments on the loan.

32. Shortly after learning of the closing of the newly-refinanced loan, DURAND began asking CAIN about returning DURAND's title as CAIN promised to do. CAIN repeatedly assured DURAND that the appropriate documents would be forthcoming and that CAIN was making the payments under the new loan. CAIN informed DURAND that CAIN was very busy

with PAGSTA business matters, which DURAND knew to be true, and CAIN apologized for the delay.  CAIN reassured DURAND that CAIN intended to return the title in the near future.

33. DURAND became increasingly concerned over CAIN's delays in returning the title to the Property and DURAND made numerous requests to CAIN and to CAIN's attorney.  Finally, on or about October 11, 2004, CAIN and his attorney met with DURAND, in California, for the stated purpose of providing the long-promised document.

34. At the October 11, 2004 meeting, CAIN executed and delivered to DURAND a document entitled "DEED," purportedly to reconvey title to DURAND as had been promised.  Based on estate planning advice that DURAND had received, DURAND requested that the Property be deeded directly to his nephew, DURAN, rather than back to DURAND.  The October 11, 2004 reconveyance "DEED" showed DURAN as the transferee.

35. CAIN's signature, however, was not notarized on the "DEED."  CAIN refused to allow his signature to be notarized despite DURAND's requests.

36. After the refinance had closed escrow, and after DURAND received the "DEED" from CAIN in October 2004, DURAND learned, on or about February 20, 2005, that his residence was posted with a Writ of Execution and Notice of Intent to Sell, by FIRST COASTAL.  DURAND immediately hired a real estate attorney and undertook immediate action to try to save his home.  DURAND learned, and herein alleges upon such information and belief, that:

(a) prior to executing the October 11, 2004 "DEED" document intended to reconvey full legal title in the Property to DURAN, CAIN secretly and without DURAND'S knowledge, pledged the condominium as collateral to support the personal guarantee of February 19, 2004, in connection with the $1,000,000 line of credit from FIRST COASTAL to PAGSTA, the company that CAIN controlled; that PAGSTA had defaulted without a payment on the line of credit, in

8

February 2005, and later filed for bankruptcy; that FIRST COASTAL had sued CAIN on the personal guarantee; and that CAIN had settled with FIRST COASTAL through a Stipulated Judgment against CAIN for approximately $1,300,000 and upon which FIRST COASTAL initiated collection proceedings against DURAND's condo; and

(b)     the "DEED" executed and delivered by CAIN on or about October 11, 2004, although facially reconveying all rights, title and interest to the Property to DURAN, was incapable of being recorded with the Los Angeles County Recorder due to the lack of a notarized signature by the transferor.

**The Plaintiffs' California Lawsuit**

37.     In response to FIRST COASTAL's Writ of Execution as against the Property, and following their investigation and attempts to resolve matters informally, on or about October 12, 2005, the Plaintiffs filed a lawsuit against CAIN and certain others, in the Superior Court of the State of California for the County of Los Angeles, case number BC 339947 (the "California Lawsuit"). The California Lawsuit remains pending, and it currently includes a third-party action as well as an intervention. BofA is presently one of the defendants in the California Lawsuit.

38.     The California Lawsuit was "on call" for trial when CAIN filed his bankruptcy petition.

39.     In the California Lawsuit, Plaintiffs' causes of action include, without limitation:

(a)     Plaintiffs' claim for declaratory relief, seeking a declaration finding in the Plaintiffs title and ownership in the Property, and invalidating the Deed of Trust to BofA;

(b)     Plaintiffs' claim to quiet the title in the Property, terminating the asserted interests of CAIN and BofA;

9

(c)  Plaintiffs' requests for a temporary restraining order and preliminary injunction regarding any foreclosure attempt by BofA;

(d)  DURAND's fraud claims against CAIN for, among other things, CAIN's fraud and scheme and to obtain, use, and retain the Property, including by pledging the Property for CAIN's own purposes; and

(e)  DURAND's claims of Financial Abuse of an Elder Adult, under California Welfare & Institutions Code Sections 15657, *et seq.*, based on, *e.g.*, CAIN's fraud and scheme against DURAND with respect to the Property.

40.  On or about February 6, 2006, Plaintiffs entered into a conditional settlement with FIRST COASTAL, under which Plaintiffs agreed to pay $175,000 to FIRST COASTAL in exchange for FIRST COASTAL's forbearance from collection efforts against the Property, and a release of all claims by FIRST COASTAL as to the Property to apply in the event the Plaintiffs were ultimately successful in recovering rightful title to the Property.

41.  CAIN's frauds, schemes and wrongful conduct identified herein are all pending in the California Lawsuit, and have also caused Plaintiffs to incur hundreds of thousands of dollars in attorneys' fees to prosecute and defend multiple legal actions in state and federal courts in California and Georgia, including in two Chapter 11 cases by CAIN, the first case dismissed.

**<u>Fraudulent Misrepresentations by CAIN Regarding the Property</u>**

42.     CAIN made the following fraudulent misrepresentations to Plaintiffs, beginning in 2003 and continuing through October 11, 2004:

(a)     Misrepresenting and creating under false pretenses a promise to "refinance" DURAND's existing mortgage to obtain a lower payment for DURAND and to return title to him, when in fact CAIN sought to divest title and ownership from DURAND and to retain and use the Property for CAIN's own purposes;

(b)     Misrepresenting and creating under false pretenses a promise to accomplish the "refinance" of DURAND's existing mortgage by means of a temporary transfer of title to CAIN, followed by reconveyance to DURAND upon completion of the promised goal, when in fact CAIN had no intention of making a valid reconveyance to Plaintiffs;

(c)     Misrepresenting to and deceiving DURAND by executing and delivering to him a notarized document entitled "Cancellation of Note" that purported to confirm the "non existence" of any debt;

(d)     Misrepresenting the supposed need for a leasehold with CAIN, which Plaintiffs are informed and believe was actually for the purpose of CAIN misrepresenting to third parties that DURAND's sole interest in the Property was merely a "tenancy," so as to allow CAIN to borrow against the Property for CAIN's own purposes; and to induce DURAND to deliver payments of purported "rent" which were promised to be paid to DURAND's existing lender, so that CAIN could actually keep and use the funds for himself; and

(e)     By delivering to DURAND a restricted "DEED" document that CAIN then knew could not be recorded, for the purpose of CAIN concealing from Plaintiffs the fact that the Property had been pledged by CAIN as security for a line of credit for CAIN's benefit.

11

**CAIN's Scheme to Cause DURAND to Work for PAGSTA Without Compensation**

43. In or around late 2003, CAIN solicited DURAND to provide services for CAIN's newly-formed motorcycle company, PAGSTA. In or about October 2003, CAIN, PAGSTA's Chief Executive Officer, Chairman and principal shareholder, induced DURAND to perform services, by promising DURAND that he would be paid $15,000 per month for the work, plus other fees and compensation. At that time, CAIN was aware that DURAND had experience with television commercials and that he had connections with various celebrities and other personalities. CAIN requested that DURAND help promote PAGSTA by using celebrity clients and endorsements.

44. In reliance on CAIN's promises, during the course of the next several months, DURAND expended time, expense and effort to promote PAGSTA. DURAND made contact with his friend, the late actor Dennis Hopper, who had given a preliminary agreement that he would appear in commercials and other advertisements for PAGSTA. DURAND also contacted various other personalities for PAGSTA to use their names and likenesses in the promotion of PAGSTA for compensation.

45. CAIN also promised DURAND compensation to create a television commercial for PAGSTA that was to be filmed in Sedona, Arizona. As a direct result of this particular promise, DURAND spent several days with CAIN in Sedona working on the commercial.

46. DURAND expended in excess of $30,000 on his own credit cards and incurred other charges in the promotion of PAGSTA, with continued assurances by CAIN in advance that DURAND would be reimbursed for all such costs.

47. When CAIN made all the aforementioned promises, CAIN all the while had no intention of having DURAND compensated for the work or reimbursed for the outlays. DURAND relied on all of such representations and thereupon performed the work and advanced the costs.

**CAIN's Scheme to Cause DURAND to Assist with H&R Block Suit Without Payment**

48. Following several months of discussions between CAIN and DURAND and CAIN's solicitation of advice from DURAND, in or about May 2003, CAIN specifically asked DURAND to formally and more actively assist CAIN with the multi-million dollar lawsuit that CAIN intended to bring against H&R Block, Inc. The lawsuit was subsequently filed by CAIN, in the United States District Court for the Northern District of Georgia.

49. CAIN knew that DURAND had some experience with legal research, similar to a paralegal's, and therefore promised DURAND that he would be compensated $5,000 per month for DURAND's assistance. As further compensation, CAIN also promised and granted DURAND a lien against 20% of any recovery on the H&R Block lawsuit. CAIN also promised DURAND that DURAND would be repaid any costs that he expended in relation to the lawsuit effort.

50. DURAND worked with CAIN on the lawsuit from November 2003 until April 2005 and was never paid or reimbursed.

51. When CAIN made all the aforementioned promises, CAIN all the while had no intention of compensating DURAND for the work on CAIN's lawsuit. DURAND relied on all of such representations by CAIN and performed the work for CAIN in response to CAIN's promises.

52. CAIN knew that his promises and representations were false when made, and they were made without an intention to perform.

## **COUNT I – 11 U.S.C. § 523(a)(2)**

53. Plaintiffs hereby re-allege and incorporate by reference all heretofore mentioned facts and allegations in this Complaint as if fully set forth herein.

54. Through fraudulent misrepresentations and omissions by Defendant to Plaintiffs, Defendant took title to the Property to keep and not re-transfer to Plaintiffs as agreed, and to instead use the Property for CAIN's own purposes.

55. Through fraudulent misrepresentations and omissions by Defendant to DURAND, Defendant caused DURAND to work for PAGSTA and to work on CAIN's H&R Block lawsuit while never intending to pay the promised compensation.

56. Defendant made material false representations and omissions to Plaintiffs, with the intention of deceiving Plaintiffs.

57. Plaintiffs relied on the omissions and the false representations by Defendant.

58. Plaintiffs' reliance on Defendant's omissions and false representations was justified.

59. Plaintiffs sustained losses as a result of the omissions and false representations made by Defendant to Plaintiffs.

60. Defendant incurred his debts to Plaintiffs and obtained money and property from Plaintiffs, through false pretenses, false representations, and actual fraud.

61. Defendant's debts to Plaintiffs are nondischargeable under 11 U.S.C. § 523(a)(2)(A).

62. Plaintiffs demand (a) a monetary judgment in the principal amount to be proven, including, without limitation, punitive damages, plus interest, attorneys' fees and costs, and (b) a determination that said amount is nondischargeable under 11 U.S.C. § 523(a)(2)(A).

## **COUNT II – 11 U.S.C. § 523(a)(6)**

63. Plaintiffs hereby re-allege and incorporate by reference all heretofore mentioned facts and allegations in this Complaint as if fully set forth herein.

64. Defendant, by and through his willful and malicious acts as alleged herein, deliberately and intentionally caused injury to Plaintiffs. Defendant specifically intended to harm Plaintiffs.

65. Defendant acted wrongfully and without just cause, and excessively.

66. Defendant obtained money and property from Plaintiffs, and harmed Plaintiffs and their property, by Defendant's willful and malicious injury.

67. As alleged herein, Defendant engaged in a scheme to take title to the Property and to not re-transfer it back to Plaintiffs as agreed, but to instead use the Property permanently for CAIN's own purposes. CAIN pledged the Property to third parties, without the knowledge or consent of Plaintiffs, and CAIN subjected Plaintiffs' Property to foreclosure.

68. As alleged herein, CAIN engaged in a scheme to cause DURAND to work for PAGSTA and to assist with CAIN's H&R Block lawsuit but without the promised compensation.

69. CAIN willfully and maliciously took and retained Plaintiffs' property and services.

70. CAIN took and misappropriated property of Plaintiffs.

71. Defendant's debts to Plaintiffs are nondischargeable under 11 U.S.C. § 523(a)(6).

72. Plaintiffs demand (a) a monetary judgment in the principal amount to be proven, including, without limitation, punitive damages, plus interest, attorneys' fees and costs, and (b) a determination that said amount is nondischargeable under 11 U.S.C. § 523(a)(6).

**WHEREFORE**, Plaintiffs, RUDY C. DURAND and JEFFREY DURAN, respectfully pray that, pursuant to 11 U.S.C. § 523(a)(2) and (a)(6):

(a)  the Court enter a money judgment in favor of Plaintiffs and against Defendant, in the principal amount to be proven, including, without limitation, punitive damages, plus interest, attorneys' fees and costs;

(b)  the Court enter a judgment declaring and determining that, under 11 U.S.C. § 523(a)(2) and § 523(a)(6), the Defendant's indebtedness to Plaintiffs in the above amount be excepted from the Defendant's general discharge and be non-dischargeable; and

(c)  Plaintiffs be granted such other and further relief as may be just.

This 11th day of April, 2013.            **COHEN POLLOCK MERLIN & SMALL**
                                         A Professional Corporation
                                         Attorneys for Plaintiffs

                                         By:  /s/ Bruce Z. Walker
                                              Bruce Z. Walker
                                              Georgia Bar No. 731260

3350 Riverwood Parkway, Suite 1600
Atlanta, GA 30339
(770) 858-1288; Fax (770) 858-1277
bwalker@cpmas.com


James D. Roberts
CA Bar No. 122075
Law Offices of James D. Roberts
20301 Ventura Blvd, Ste. 126
Woodland Hills, CA 91364
(818) 535-0247
*Pro Hac Vice* Application to be Filed
Attorneys for Plaintiffs

838423.3